Journal of Multistate Taxation and Incentives
July, 1999

**Sales and Use Taxes**

***5** THE **INTERNET TAX FREEDOM ACT**: WILL IT BE A SUCCESS OR A FAILURE?

**Kenneth H. Silverberg and Mark M. Foster [FNa1]**

Copyright © 1999 RIA

Much understanding of the issues can be gained from a careful examination of the work of the NTA's electronic commerce tax project.

***6** In late 1998, Congress passed the **Internet Tax Freedom Act** (ITFA) and the President signed it as a part of the fiscal 1999 omnibus budget legislation. [FN1] Generally, the ITFA imposes a three-year moratorium on various types of state and local taxes on electronic commerce, and calls for the creation of an advisory commission to study the state and local, as well as federal and international, tax treatment of Internet transactions. Following the study, the commission is to issue a report to Congress, including the possible recommendation of tax- and technology-neutral legislation.

Rep. Christopher Cox (R-Cal.), the original sponsor of the House bill, explained the impetus for the enactment of the ITFA as follows:

"The **Internet Tax Freedom Act** is needed not just to give the Net room and time to grow. It is also needed because the Net is inherently susceptible to multiple and discriminatory taxation in a way that commerce conducted in more traditional ways is not. The very technologies that make the Net so useful and efficient, notably its decentralized, packet-switched architecture, also mean that several States and perhaps dozens of localities could attempt to impose a tax on a single **Internet** transaction. The **Internet Tax Freedom Act** will protect commerce conducted over the **Internet** from being singled out and taxed in new and creative ways, and will give Americans the reassurance they need that they will not be hit with unexpected taxes and tax collecting costs from remote governments." [FN2]

Passage of the ITFA has given taxpayers several new defenses against some types of state and local taxes, but these weapons have yet to be tested in the courts. It is more significant that additional new taxes have not been enacted on electronic commerce since the moratorium became effective. Still, it is useful to explore some of the defenses created by the ITFA. In addition, many policy issues face the ITFA-mandated advisory commission, which began its work in June 1999. It appears that the progress, or lack thereof, on the sales and use tax policy front made by the National Tax Association's Communications and Electronic Commerce Tax Project (the "NTA tax project") will foreshadow the coming policy debate by the advisory commission. Much understanding of the issues can be gained from a careful examination of the work of the NTA tax project. [FN3]

**Moratorium on Taxation of Internet Access**

The ITFA imposes a three-year moratorium on certain state and local taxation of Internet access services, and on multiple or discriminatory taxes on electronic commerce. The moratorium began on 10/1/98 and runs through 10/21/01. In addition to the moratorium, the ITFA declares that the Internet should be free of federal taxes, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

establishes an advisory commission to study the domestic and international taxation of electronic commerce and to recommend to Congress policies regarding the taxation of such services.

The first category of taxes [FN4] covered by the moratorium is any "taxes on Internet access" that were not "generally imposed and actually enforced" prior to 10/1/98. The legislation contains various detailed operational rules by which one can determine whether a tax was "generally imposed and actually enforced." Many of these provisions will enable a taxpayer who is protesting a tax assessment to make the initial assertion that the tax is barred, and will, in effect, shift the burden of proof to the tax authority to demonstrate that its tax still may be levied despite the ITFA.

As a practical matter, few states or localities will want to expend the enforcement and litigation resources necessary to demonstrate their entitlement to the benefit of the grandfather clause. Thus, this provision has effectively shut down numerous new tax assessments that otherwise might have been applied to the revenue from Internet access services.

**What Internet access taxes are prohibited.** The ITFA prevents a state or political subdivision from imposing any non-grandfathered tax on Internet access until 10/21/01. The ITFA defines "Internet" to collectively include "the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio." Therefore, the key to the definition of "Internet" is the use of the TCP/IP, or any predecessor or successor protocols, by the medium involved, whether by telecommunications, cable networks, or satellite.

Furthermore, "Internet access" is defined as "a service that enables users to access content, information, electronic mail, or other services offered over the Internet, and may include access to proprietary content, information and other services as part of a package of services offered to users. Such term does not include telecommunications."

The exclusion of "telecommunications" is based on the ITFA's fundamental premise that Internet access services are separate from the underlying telecommunications infrastructure on which they currently depend. Therefore, the ITFA does not affect any taxes that may be imposed on an Internet user or provider based on the use of the underlying telephone service. An Internet access tax would be, for example, a tax on the monthly fee that an Internet user pays to an Internet service provider such as America Online or Erols. [FN5]

This provision is intended merely to prevent new and creative types of state and local taxes from being applied to Internet access charges collected by Internet ***7** access providers. Some companies other than traditional Internet access providers currently furnish services to which this portion of the moratorium applies. Others will undoubtedly be brought on-line during the moratorium period. Examples of protected transactions include:

1 Cable modem services provided by cable operators, wireless carriers, electric utilities, and others.

2 Sales of digital products or information services that may be accessed via the Internet (even if they also may be accessed by other, non-Internet methods), so long as the sale is "bundled" with Internet access.

When other services or products are bundled with Internet access, a state or locality actually may not be prohibited from imposing a tax on the portion of the revenue attributable to the products or to the services other than Internet access. Nevertheless, it is unlikely that a jurisdiction will choose to impose taxes that raise the additional issue of unbundling, or allocation of purchase price. Unless the tax evasion is egregious, the tax authorities will more likely defer any such assessments until after the moratorium ends. This "chilling effect" on tax assessments may create opportunities for some businesses to offer tax-free products or services during the moratorium period merely by bundling them with Internet access.

**What Internet access taxes are allowed--the "grandfather provision."** As stated above, the moratorium on Internet access taxation applies only to taxes that were not "generally imposed and actually enforced" prior to 10/1/98. Thus, under the ITFA, the only taxes that a state or political subdivision may impose on Internet access during the moratorium are those that were authorized by statute before 10/1/98. In addition, for a tax to be deemed "generally imposed and actually enforced," either of the following had to have occurred before 10/1/98:

1 The appropriate administrative agency of the state or political subdivision had to issue a rule or other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

public proclamation such that the service provider had a reasonable opportunity to know that the agency interpreted and applied the tax to Internet access service.

2 The tax on charges for Internet access generally was collected by the state or political subdivision.

At least 11 states and the District of Columbia sought to impose some form of a tax on Internet access prior to 10/1/98. [FN6] Some of these states tax Internet access as a telecommunications service, while others tax such access as an information or data-processing service.

**General Moratorium on Taxation of Electronic Commerce**

The second category of taxes covered by the ITFA moratorium is much broader than the first. The ITFA prohibits any state or political subdivision from imposing any "multiple or discriminatory" tax on "electronic commerce. " Electronic commerce is defined to include much more than the mere provision of Internet ***8** access, and thus it is much more likely that taxpayers other than Internet access providers will benefit from this provision. Under the ITFA, electronic commerce is "any transaction conducted over the Internet or through Internet access, comprising the sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration, and includes the provision of Internet access."

When electronic commerce is implicated in connection with any product or service, the ITFA provides a defense to any tax that is "multiple or discriminatory." Such a levy could include not only income and franchise taxes but also property and sales and use taxes, as well as a vendor's obligation to collect and remit sales taxes. Most types of excise taxes also will be included. The ITFA, however, specifically excludes any franchise fees imposed by a state or local authority, and the universal service fee and certain other telecommunications fees.

The ITFA defines "discriminatory tax" and "multiple tax," but not with a great deal of precision. It is clear that Congress had certain types of activities in mind for protection, but it could not effectively predict every means by which a state or local tax might discriminate against electronic commerce. Accordingly, taxpayers should have plenty of leeway to assert that specific taxes are either discriminatory or multiple when applied to particular types of revenue.

**Discriminatory Taxes**

The incidence of discriminatory taxes most familiar to state tax practitioners is a levy that favors local commerce over interstate commerce. But the term should be read more broadly to include any unequal application of a particular tax to transactions that should be taxed equally.

The ITFA finds the imposition of a tax discriminatory if the tax disadvantages electronic commerce when compared to similar commerce conducted through any other means. This discrimination can result from either the coverage of the tax or the application of differential tax rates.

A state or local tax on electronic commerce will be found discriminatory if the tax is not "generally imposed and legally collectible" [FN7] in transactions involving similar property, goods, services, or information accomplished through other means. The ITFA also prohibits a state or local government from taxing electronic commerce in a manner that would result in the imposition of a different tax rate on electronic commerce (unless the rate is being phased out by the state or locality).

**Example.**State A attempts to impose a sales tax on the purchase of clothing over the Internet, but it does not tax clothing purchased via telephone or mail-order catalog. Clearly, this tax is discriminatory and thus prohibited. The same result would occur if state A generally imposes and legally collects sales tax on the purchase of clothing via telephone or mail-order catalog but at a rate lower than that applied to such purchases conducted over the Internet.

**Tax imposed on a different person.** A state or local tax law also would be discriminatory if, in an electronic commerce transaction, it imposed a tax-payment or tax-collection obligation on a person or entity different from the person or entity subject to the tax ***9** in transactions involving similar property, goods, services, or information provided through other means.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Example.**State A imposes a sales tax collection obligation on vendors (either in- or out-of-state) selling tangible personal property over the Internet and shipped to a customer in the state. The state does not impose such an obligation on vendors conducting similar transactions via telephone or mail-order catalog. Thus, the requirement to collect and remit such tax will be prohibited as discriminatory.

**Tax imposed at a higher rate.** While a tax on an Internet access provider may be permitted under the grandfather clause, it still may run afoul of the prohibition on discriminatory taxes. Thus, a state or local tax on Internet access service will be discriminatory if it establishes a classification of Internet access provider or online service provider in order to impose the tax on such providers at a rate higher than the rate generally applied to providers of similar information services delivered through other means. The full scope of this analogy is unclear. Nevertheless, states and localities would seem to be barred from classifying an Internet access providers as a public utility for the purpose of applying a higher tax rate on the service.

The more common application of this prohibition probably will be in the area of sales of goods, either tangible or intangible, involving electronic commerce. These electronic sales compete with traditional retail sales, as well as with mail-order sales and other types of remote commerce for which states have long attempted to impose tax-collection duties on vendors. The ITFA's ban on discriminatory taxation effectively precludes states from applying some type of blended statewide rate to transactions conducted by means of electronic commerce, unless the same blended rates were applied to all sales. It would be permissible, however, to apply a lower rate to electronic commerce, i.e., to discriminate in favor of such commerce.

**Electronic nexus; agency nexus.** The ITFA also is intended to protect out-of-state electronic commerce vendors from being unfairly burdened with the obligation to collect sales taxes that are not applied to mail-order and other remote sellers. Thus, for example, a "discriminatory tax" includes a sales tax collection obligation that is based on (1) the ability to access a remote seller's website by computer ("electronic nexus") or (2) the theory that an Internet service provider is an in-state agent of the seller ("agency nexus").

It is somewhat clear, [FN8] for purposes of the moratorium, that Congress did not consider that an out-of-state vendor's use of an in-state computer server to create or maintain a site on the Internet would constitute the "substantial physical presence" required by Quill Corp. v. North Dakota. [FN9] It is less clear whether Congress would make such a sweeping generalization for purposes of permanently applying the Commerce Clause to electronic commerce. This question undoubtedly will be tested in the courts if Congress fails to address it at the end of the moratorium. The courts' answer can then be expected to either incite or stifle the development of an industry of offshore computer service providers, and providers situated in states that have no sales or use tax.

States and localities also are prohibited from treating a provider of Internet access or online services as an agent of a remote seller that uses the service.

**Example.**Vendor C, conducting business from state B, sells tangible personal property over the Internet using a computer server in state A. C has no physical presence in state A. Under the ITFA, any attempt by state A to impose a sales tax collection obligation on C based on the vendor's use of a server in state A will be prohibited.

**Example.**The facts are the same as in the prior example except the server is in state D and is owned by an Internet access provider in state A. The provider uploads C's site to the Internet, or processes customer orders for C through the use of its server in state D. Under the ITFA, although the Internet access provider has nexus with state A, that state may not impose an obligation on the provider to collect the tax as C's agent.

**Different views on one "discriminatory" tax.** One "real life" example of a tax that would seem to be barred as discriminatory under the ITFA is the application of the Chicago Personal Property Lease Transaction Tax to purchases of information services. Since 1989, Chicago has consistently applied this tax to all charges for the use of a computer and its software, including database search charges. [FN10]

In the city's Lease Transaction Tax Ruling #13, issued 9/18/92, the Director of Revenue ruled:

"Where possession of a computer is not transferred, use of the computer is deemed to occur at the location

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of the access device used to access the computer. Therefore, if the user's access device is located in the City of Chicago, the Chicago Transaction Tax applies to all charges for the use of the computer and its software, including, but not limited to, the running or execution of computer programs.... Unless charges for the use of the computer include charges for services performed by the computer-provider's personnel at the time of the transaction, the transaction is considered to involve charges solely for the use of personal property and not for the sale of a service.... Thus, charges imposed on the user for the user's access to, or retrieval of information from, a computer or its database are charges for the use of personal property and not charges for the sale of a service."

During the congressional debates on the ITFA, Chicago's chief assistant corporate counsel was reported to have stated that if Congress were to enact such legislation, city officials feared losing as much as $15 million per year from the 6% tax that the city imposes on database use. Referring to the ITFA grandfather clauses then being debated in House and Senate committees, the Chicago counsel stated: "We are worried they won't cover our tax." [FN11]

As the legislative process turned out, the Chicago tax was not grandfathered. If the tax is applied to information obtained online and not to information acquired through conventional means, it is discriminatory in the sense specified in the ITFA. Thus, since October ***10** 1998, the city's collection of the tax has been barred by federal law. [FN12] Nevertheless, recent informal contact with the Chicago Law Department indicates that the city continues to assess and collect the tax on purchases of information services, believing that the tax is grandfathered by the ITFA. The Department had no response to the suggestion that the ITFA does not grandfather discriminatory taxes.

Some other examples of discriminatory taxes that one might encounter include:

1 Sales tax on downloads of digital products or information that are not taxed in tangible form (e.g., books, magazines, newspapers, floppy disks, CDs, or videotape).

2 Differential sales tax rates applied to electronic vs. tangible versions of the same product or information.

3 A sales tax collection obligation asserted against a different entity in electronic vs. tangible commerce (e.g., credit card companies in electronic commerce vs. retailers in conventional commerce).

4 Gross receipts or business license taxes that apply to electronic and conventional commerce in different ways or at different rates.

5 Personal property taxes applied to equipment used in electronic publishing, while conventional presses used to print the same content in magazines, newspapers, or books are exempt under manufacturing or other special exemptions.

6 Income taxes applicable at higher effective tax rates to electronic commerce than to conventional commerce, because of some nexus or apportionment rule.

**Multiple Taxes**

Some taxpayers also may be able to claim the ITFA defense against a "multiple tax," which is any tax imposed by a state or locality on essentially the same electronic commerce that is also subject to another tax imposed by another state or locality (other than sales or use taxes imposed by a state and its own political subdivisions), whether or not at the same rate or on the same basis, without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions. This provision is intended to avoid double taxation of the same transaction or service in either the same taxing jurisdiction or two or more taxing jurisdictions. The following example illustrates one instance of a multiple tax.

**Example.**State A classifies Internet access services as telecommunications services. Also, the state taxes the underlying telecommunications service that is used to provide Internet access, but does not provide for a credit or other mechanism to avoid the double taxation of the access service and the means for its delivery. Under the ITFA, state A's tax scheme will be prohibited as a multiple tax because, as a levy on both the service and the means of delivering that service, it taxes the same service twice.

Multiple sales or use taxes will rarely occur because of the general availability of resale exemptions for vendors, and because of the credit typically allowed against "compensating use taxes" for prior payment of sales taxes. The ITFA also makes it clear that localities in a state may add a local surcharge to transactions taxed at the state level without resulting in multiple taxes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The multiple-tax rules could have some application with regard to income, gross receipts, or franchise taxes paid by certain taxpayers. If some electronic commerce sales were subject to different income or franchise tax apportionment regimes in two jurisdictions, a portion of the sales might be taxed in both jurisdictions. In that situation, the levy should be deemed a multiple tax.

It seems unlikely, however, that Congress intended to create an ITFA defense to be used by taxpayers subject to apportioned income taxes in, e.g., one state applying single-factor apportionment and another using a double-weighted sales factor, but a reasonable case could be made that the rules apply in that situation. Some business with a significant liability for a potential multiple income tax undoubtedly will attempt to test the limits of this provision.

**Exceptions to the Moratorium**

The ITFA offers several exceptions that would allow states to impose taxes despite the moratorium.

**Harmful to minors.** The ITFA's moratorium on Internet taxation may not be used as a defense by any taxpayer that knowingly and for commercial purposes communicates material that is obscene or otherwise harmful to minors. [FN13] The exception to the moratorium may be avoided, however, if the taxpayer employs procedures such as requiring the use of a verified credit card, debit account, adult access code, or adult personal identification number in order to restrict access to such material by persons under age 17. The exception also does not apply to (1) ***11** telecommunications carriers providing telecommunications services, (2) providers of Internet access services or Internet information location tools, and (3) persons engaged in transmitting, storing, retrieving, hosting, formatting, or translating (or any combination thereof) a communication made by another person, without selecting or altering the communication.

**Screening software.** In connection with agreements entered into after 4/20/99 between Internet access service providers and their customers, the ITFA requires that the service provider offer "screening software," i.e., software that will permit the customer to limit access to material on the Internet that is harmful to minors. The service provider may charge a fee for the software. Service providers failing to comply with this requirement will be excepted from the moratorium on discriminatory or multiple taxes, as well as taxes on Internet access.

**Bundled services.** The moratorium applies only to that portion of the medium that is used to provide Internet services. Thus, consider for example a cable network that provides Internet access employing the Transmission Control Protocol/Internet Protocol. The same network also provides cable television programming, which does not employ TCP/IP or any predecessor or successor protocols. Accordingly, the ITFA moratorium applies to only the Internet access service, i.e., the service using TCP/IP.

Although the Internet service and the underlying medium can be distinguished in theory, it may be much more difficult to separate them in practice. For instance, a state or locality may impose its personal property tax on the value of the coaxial cable used by a cable television operator. The cable operator also provides its residential customers with Internet access over the same coaxial cable. In applying the personal property tax, it is not clear how the value of the coaxial cable will be apportioned between the different services. Still, it would seem that the ITFA might provide a defense against all or part of the property tax assessment in such a situation.

**Liabilities and pending cases.** The ITFA does not affect either a taxpayer's liability for any taxes accrued and enforced prior to 10/1/98, or ongoing disputes relating to any taxes. Accordingly, any taxpayer currently litigating the imposition of a state or local tax on Internet access or on electronic commerce may not use the ITFA as a defense in such proceedings.

**The Advisory Commission**

As noted above, in addition to imposing the moratorium, the ITFA establishes a temporary commission--the Advisory Commission on Electronic Commerce (ACEC)--to study Internet taxation. The ACEC consists of 19 appointed commissioners, including the Secretaries of Commerce and Treasury and the U.S. Trade Representative (or their respective delegates). In addition, the ACEC includes eight representatives of state and local government

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and an equal number from the electronic commerce industry, telecommunications carriers, local retail businesses, and consumer groups.

The ACEC is directed to conduct a thorough study of international, federal, state, and local taxation of Internet access and transactions conducted on the Internet. The issues to be examined may include the following:

1 Foreign market barriers for U.S. vendors engaged in electronic commerce.
2 The imposition of consumption taxes on electronic commerce.
3 The impact of the Internet and Internet access on the revenue base.
4 Model state legislation that would provide tax uniformity and neutrality.
5 The effects of taxation on interstate sales, including transactions using the Internet.
6 Ways to simplify taxes imposed on the provision of telecommunications services.

***12** The ACEC is to report its findings to Congress, including any legislative recommendations necessary to address those findings, within 18 months of the enactment of the ITFA.

Recently, the ACEC cleared a major roadblock to its operation. In May 1999, an alleged imbalance in the composition of the ACEC was rectified by the resignation of one member from industry who was then replaced by a government representative. The initial meeting of the ACEC took place in Williamsburg, Virginia, in June. [FN14]

The possibility of sales and use tax reform for electronic commerce transactions is among the issues to be examined by the ACEC. This subject also has been considered in some detail by the NTA tax project, which is expected to issue a report on its deliberations early in the summer of 1999. The ACEC, if it so chooses, may be able to get a substantial head start on its decisions and recommendations for consumption taxes by referring to the NTA tax project report.

**The Expected Debate on Consumption Tax**

One issue that the ACEC will have to consider is the need for reform of the present system of sales and use taxes as it applies to electronic commerce. [FN15] The commissioners undoubtedly will conclude that the current system is unlikely to capture very much tax revenue from the growing volume of Internet commerce. Furthermore, for reasons of economic neutrality and political fairness, they also will conclude that the taxation of electronic commerce cannot be considered in a vacuum. Electronic commerce is merely another subset of remote commerce, which also includes business conducted by traditional mail-order vendors and commerce involving the shipment of goods to a buyer's destination in a state where the vendor has no physical presence.

**State and local governments' perspective.** The erosion of the consumption tax base represented by the growth of electronic commerce will pose a serious threat to the ability of state and local governments to balance their budgets and pay for necessary governmental services in years to come. These governments will likely conclude that it is in their best interest to reform their sales and use tax schemes so that they function more effectively.

State and local governments are directly affected by the erosion of their tax base. They have already suffered a considerable erosion as a result of the migration of traditional retail business to the mail-order industry. Pursuant to the U.S. Supreme Court's holding in Quill, mail-order vendors generally have been protected from sales and use tax collection responsibility in connection with goods shipped to their out-of-state customers. Add to this tax-free commerce the predicted volume of future sales conducted over the Internet, and the revenue shortfalls quickly reach levels that will jeopardize the ability of state and local governments to finance their delivery of services. Government's motivation to reform the tax structure is obvious.

**The business community's view.** Business motives are less uniform, and depend on whether a company takes a long- or short-term view of the issue.

**The short-term scene.**In the short-term, businesses would be well advised to continue to rely on Quill to avoid tax-collection duties in most jurisdictions to which they ship orders. Obviously, no tax system is simpler to comply with than one that imposes neither a payment nor a collection obligation. The ability to sell products at retail without sales or use taxes creates an undisputed competitive advantage.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

State and local governments have it within their power today to overturn the effects of Quill. By simplifying the administrative burden of complying with the sales and use tax laws of roughly 6,000 jurisdictions, state and local governments would effectively eliminate the constitutional impediments to their imposing a tax-collection duty on remote sellers. Even though such vendors lack a substantial physical presence, the tax-collection duty would no longer create an undue burden on interstate commerce. Absent that burden, Quill would no longer apply. Thus, it is not only Quill that has caused the erosion of the sales tax base but also the unwillingness of states and localities to voluntarily reform their thousands of Byzantine tax systems.

Some businesses believe that it is dangerous to start advocating simplification of the sales and use tax system because, if the process proves too successful, it could backfire into creating a universal obligation to collect taxes. Gone would be the competitive advantage enjoyed by remote sellers, along with their escape hatch from the duty to collect and remit sales taxes.

The status quo offers businesses the advantages of simplicity and competitive pricing of their products. Many businesses find these benefits so compelling that they feel it is a violation of their duty to their shareholders to do anything that might accelerate any change to the status quo. Also, many of these businesses actively participate in the sales tax policy debate for the principal purpose of blocking any efforts to reform or change the current system. It is hard to fault their logic, at least in the short term.

**The long-term view.**Other representatives of the business community take a longer-term view of the problem, and thus arrive at exactly the opposite conclusion as to their shareholders' best interests. Employing their logic, one realizes that sales and use taxes are economically imposed on consumers, not on vendors. Further, the objective of business is to avoid becoming liable for these taxes. Businesses' role generally is merely to collect the applicable taxes on behalf of the appropriate government entity. If the business mistakenly fails to collect a tax, or collects too little, the tax becomes the business's cost. Thus, it is in business's best interest to encourage the adoption of a simple ***13** sales and use tax system that functions efficiently and operates with neutrality among competitors.

Moreover, businesses that favor the long-term view believe that if sales and use taxes are not reformed, the tax-base erosion will lead to massive revenue shortfalls for state and local government. Faced with either reducing services or funding the cost of those services via a different tax source, governments will choose the latter course. Furthermore, that different source likely will involve taxes for which business owners are ultimately liable, such as income or property tax.

Businesses interested in seeing the cost of government continue to be substantially funded by sales taxes should work to help fashion a sales tax system that can function effectively in an economy dominated by remote sellers. Thus, businesses should advocate not only radical simplification of the present sales and use tax systems but even the imposition of a broader duty to collect sales taxes on remote commerce.

**Implications for the income tax.** Regardless of whether a particular business believes in the preservation of the status quo or in radical simplification and a broader sales tax base, all agree on one concept-- corporate income taxes are a direct cost to their shareholders, and should be minimized.

Businesses also believe that, generally, a company does not have income tax nexus unless it has a substantial physical presence in the taxing jurisdiction. Accordingly, many multistate enterprises avoid state income taxes on a substantial portion of their business because their income is allocated to a non-nexus state.

By contrast, state governments are anxious to point out that Quill does not apply to income taxes. Through various means, the states are now attempting to expand the types of contacts with a jurisdiction that will confer income tax nexus on a business. "Economic nexus" and "agency nexus" are two theories advanced by states seeking to expand the reach of their income taxes to out-of-state businesses.

The preceding discussion of income taxes is mentioned merely as background, since a thorough discussion of these developments is beyond the scope of this article. Nevertheless, the current tension over what constitutes income tax nexus is highly relevant to the debate on sales taxes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

When an out-of-state business becomes liable for collection of a state's sales tax, the state's tax authorities also have in personam tax jurisdiction over the business. State tax officials who are attempting to diligently perform their duty to enforce the state's income tax laws will then naturally want to look closely at any out-of-state business that collects and remits sales taxes but not income taxes. This heightened scrutiny undoubtedly will lead to income tax audits and assessments in which state tax authorities will challenge a business's claim that it has no income tax nexus in the jurisdiction. Thus, if a geographically expanded duty to collect and remit sales taxes were to result from a radical simplification of the tax scheme, businesses would risk higher state income taxes.

The awareness of this causal relationship has shaped the recent debate at the NTA tax project, and undoubtedly will be reflected in the NTA's report. In the NTA policy debate, representatives of the business community took the position that they could not support simplifying and broadening the sales tax on electronic commerce unless they were simultaneously assured that the states would cease their many efforts to create economic nexus for income taxes. Representatives of state government were unable to provide such assurances, however, and negotiations at the NTA tax project reached an impasse.

**Conclusion**

The ITFA provides merely a temporary respite from taxation of electronic commerce while the commission that it created examines the issues. Given the similarity between the issues discussed at the NTA tax project and those to be examined by the ITFA-mandated ACEC, the NTA results likely will foreshadow what may be expected to happen when the ACEC begins its consideration of sales tax reform. The ACEC commissioners probably will reach a similar impasse unless they are willing to acknowledge the necessary linkage of sales taxes to income taxes.

**Sidebar**

***8** ITFA's Limited Conditions for Taxation

Under the ITFA, for a state or locality to impose a tax on an electronic commerce transaction, at least two conditions must be satisfied:

1 The imposition of the tax, and the rate at which it is imposed, must be the same as they would be had the transaction been conducted via non-electronic commerce.

2 The obligation to collect the tax must be imposed on the same person or entity as in non-electronic commerce transactions (e.g., in both instances, the vendor has the duty to collect and remit the tax).

Thus, for example, the ITFA's moratorium on taxation of electronic commerce will not apply to state and local sales taxes imposed on Internet transactions at the same rate and in the same manner as on mail-order catalog transactions.

[FNa1]. KENNETH H. SILVERBERG AND MARK M. FOSTER KENNETH H. SILVERBERG is a partner and MARK M. FOSTER is an associate in the Washington, D.C., office of the law firm of Nixon Peabody LLP (formed through the merger of their former firm, Nixon, Hargrave, Devans & Doyle LLP, with the firm of Peabody and Brown). Mr. Silverberg is a member of the D.C. and Virginia bars, and Mr. Foster is a member of the Maryland bar.

[FN1]. Title XI of the Omnibus Consolidated and Emergency Appropriations Act of 1998, P.L. 105-277, 10/21/98.

[FN2]. H. Rep't No. 105-570, 105th Cong., 2d Sess., part 1 (1998).

[FN3]. See the discussion in the text below. For background on the NTA tax project, see Houghton, "The Federal Legislative and NTA Tax Project Initiatives on Electronic Commerce Taxation," 8 JMT 148 (Sep/Oct 1998).

[FN4]. Taxes, as defined by the ITFA, do not include "any franchise fee or similar fee imposed by a State or local franchising authority, pursuant to section 622 or 653 of the Communications **Act** of 1934 [ 47 USC sections 542, 573], or any other fee related to obligations or telecommunications carriers under the Communications **Act** of 1934 [ 47 USC section 151 et seq.]."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN5]. H. Rep't No. 105-570, supra note 2, which accompanied an earlier version of the ITFA, discusses **Internet** access service providers, stating: "In recent years, we have seen a significant growth in the number of service providers offering consumers access to the **Internet.** Such services are known as **Internet** access services. The service providers could be pure access providers (such as Erols), access providers that also offer content services (such as America Online), or other service providers that have begun to offer **Internet** access in conjunction with other regulated or unregulated activities (such as a telephone or cable company that offers **Internet** access in conjunction with the provision of telephone or cable service). **Internet** access providers and online service providers operate in a competitive marketplace and consumers have significant choice regarding how they access the **Internet** and how they obtain information. Recent data indicates that there are approximately 6,300 **Internet** access and online service providers in the United States."

[FN6]. The 11 states are Connecticut, Iowa, Nebraska, New Mexico, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, and Wisconsin. No opinion is implied here as to whether these jurisdictions would satisfy the ITFA's requirement that the tax be "generally imposed and actually enforced " prior to 10/1/98.

[FN7]. The ITFA does not define "legally collectible," and it is not clear why this language was used rather than "actually enforced," the phrase used in the grandfather clause. Federal legislation such as the ITFA would not seem necessary to temporarily outlaw a tax that was not legally collectible. Presumably, aggrieved taxpayers would have an adequate and more permanent remedy under state law or under the Commerce or Due Process Clause of the U.S. Constitution.

[FN8]. This principle is only somewhat clear because of the curious language employed in the ITFA. "Discriminatory tax" is defined, in part, as any tax if "the sole ability to access a site on a remote seller's out-of-State computer server is considered a factor in determining a remote seller's tax collection obligation." Here, does "sole ability" mean something like exclusive access to a website, so that sites accessible by multiple users simultaneously are outside of this provision? The more likely intended meaning is that in and of itself, the fact that a remote seller's website could be accessed in-state is insufficient to constitute substantial physical presence.

[FN9]. 504 U.S. 298 (1992). See generally Eule and Richman, "Out-of-State Mail-Order Vendors Need Not Collect Use Taxes--Yet!," 2 JMT 163 (Sep/Oct 1992). See also Nolan, "Crossing the Bright Line: Evaluating Physical Presence in Quill's Shadow," 7 JMT 244 (Jan/Feb 1998).

[FN10]. In Meites v. City of Chicago, 184 Ill. App. 3d 887, 540 N.E.2d 973 (1st Dist., 1989), the court upheld Chicago's application of the Personal Property Lease Transaction Tax to the plaintiff's Lexis/Nexis charges. For more on both this case and the tax generally, see Lieberman, "Taxing Electronic Computer Transmissions--A User Unfriendly Tax," 3 JMT 100 (Jul/Aug 1993).

[FN11]. See "Don't Touch Internet Tax, City, State Say; Publishers Lobby for Moratorium; Millions at Stake," Crain's Chicago Business, 1/5/98.

[FN12]. In doing research for this article, the authors used the Lexis/Nexis service at their office in Washington, D.C., to access Crain's Chicago Business. Had they instead done so within the Chicago city limits, they might have become the plaintiffs in the first case to be brought under the ITFA.

[FN13]. Under the ITFA, "material that is harmful to minors" includes "any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that":

1 "[T]aken as a whole and with respect to minors, appeals to a prurient interest...."

2 "[D]epicts, describes, or represents, in a patently offensive way with respect to what is suitable for minors, an actual or simulated sexual act or sexual contact...."

3 "[T]aken as a whole, lacks serious literary, artistic, political, or scientific value for minors."

[FN14]. Because of the delays caused by the dispute over the ACEC's membership, nearly half of the commission's allotted 18-month life has expired before its first meeting was held. As a result, the commission's ability to issue legislative recommendations on schedule undoubtedly will be affected, disrupting, in turn, the timetable for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantive action by Congress. Thus, as the end of the moratorium approaches, there will likely be an extensive effort to extend its three-year term. Such an effort could have considerable political appeal because a vote against extending the moratorium could be seen as a vote in favor of taxing Internet access or other electronic commerce.

[FN15]. The authors of this article participated in the NTA tax project as members of the Steering Committee representing certain media companies. Thus, the comments that follow should be read with their perspective clearly in mind.

9-JUL J. Multistate Tax'n 4, 1999 WL 1711506 (W.G.&.L.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.